Your argument now in the case of Harris v. Milwaukee. Mr. Borton May it please the court, counsel, I have the honor of representing Ms. Santosha Harris and the Bankruptcy Estate of Ms. Santosha Harris proper in this case. She has filed claims against the City of Milwaukee as well as Defendant Terence Kramerski, her former supervisor under the Civil Rights Act of 1964, particularly Title VII, for claims of quid pro quo harassment, hostile work environment, as well as retaliation. There is a separate claim filed as well for a Section 1983 claim against the City of Milwaukee. Ms. Harris has been employed by the City of Milwaukee as an infrastructure repair worker working in the barricade shop since as early as 2010. In 2012, Mr. Bromerski was promoted to be her direct supervisor overseeing her daily tasks as well as giving her assignments and signing off on her performance reviews during her career. Over that period of time, Mr. Bromerski sexually, not only assaulted, but verbally abused my client over that period of time, succumbing to an incident that occurred on May 25, 2017. Let me just go back a minute and ask you about that. Mr. Bromerski, you say direct supervisor, they say no. What's your response to their view of how he's not her direct supervisor and how the Title VII definition of supervisor is different from a lay definition of supervisor? Correct. That's been thrown around much throughout the case of the supervisor terminology. In Title VII, I agree, a supervisor has inherent powers given them to hire, fire, as well as reassign. Now, I agree and my client agrees that Mr. Bromerski may not have inherently had the authority to hire or fire her or dock her pay directly, but he did have the authority to reassign her. There's much argument made between counsel on that issue. My understanding of the case law and reviewing it extensively is there's not a hard and fast rule about what qualifies as an actionable reassignment. In this case, my client was threatened by Mr. Bromerski to be reassigned from her position to go work outdoors and pick up trash at times. So, my opinion in reading the case law, particularly in Burlington Northern and Santa Fe versus White, the perspective of which a material reassignment is judged under Title VII is from the perspective of the reasonable person in my client's shoes. And my client certainly viewed that as a tangible reassignment that would qualify, that would make, rise to the level of qualifying Mr. Bromerski as having that inherent reassignment authority making him her supervisor. I don't understand. Counsel, I don't understand what you mean. That's now about the third time you've used the word inherent. Is it something he was born with? Authority is what the employer gives him. It's not inherent in anything. So, what function are you asking us to use with that word? Inherently given to him by his employer to... Then it's not inherent. We just need to ask what authority his employer had given him. He had the authority to reassign her. You also, when you were laying out the facts, you described him as directing her activities. So, should our analysis of the supervisor question rest with the reassignment issue? Or do you also claim, it seems as if you are, that he had the power to direct her activities separate and apart from a reassignment? Or is the directing activities only referring to the reassignment? Do you understand my question? Correct. And that's, I think, a distinction that's been made over the case law history about what is a daily activity in directing her work on a given day versus reassigning her to something that is outside the scope of what she's been hired to do. And I believe counsel for the city of Milwaukee has argued that outdoor work and picking up trash and sanitation around the building was always a part of her job duties. But that's just not in the record. That was never something she was asked to do. It's not something that she ever did before. Is there a written description of her job duties in the record? There is one description of her job duties that was put into the record by the city that spans the scope of 2016 to 2022. I'm really confused by it, though, and the record. Because the written job description does refer to remove debris from the work site. And it does refer to removal of brush, grass, and weeds. So when Ms. Harris is talking about the trash assignment, I also see in the record references to it being an assignment to go with the garbage truck around the city to pick up trash, not trash related solely to the work site. So what is it? What was Berminski threatening? Was it this work site trash, which does seem to be in this job description, or was it general trash duty on garbage trucks around the city? It was general reassignment outside of the barricade shop where she was within the streets division of DPW in the city of Milwaukee. That would be different than her position as an IRW in the streets division assigned to the barricade shop. But this IRW, well, this, let's see what this is, Infrastructure Services, Department of Public Works, this does talk about removing debris from the work site. So it is in her description to remove trash around work sites and to remove brush, grass, and weeds. At least as of 2016, and I do not believe, if we are using the looking glass for judging what her job assignments were at the time, in judging reassignment from her perspective, that this is not even communicated to her that this is somehow a new job assignment she has. And again, this is a description from 2016, and this has been going on since 2012, these threats of reassignment. I don't think that you can make the leap to say that this is now some kind of new reassignment that fits within the scope of her job description. So you're right that we don't have a job description from 2012 through 2015, which are the years that the harassment first started. Correct. This is summary judgment, though. Correct. Continuing on the hostile work environment claims, particularly even if the court were to find that Mr. Proversi did not qualify as her supervisor under Title VII, there is still liability for the city as a co-worker if they cannot meet the prongs of the affirmative defenses. Particularly, the city has argued that Ms. Harris acted unreasonably, and we vociferously dispute that, particularly pointing to the totality of the circumstances when she sends the letter to the designated reporter, Dan Thomas, in 2012, while we admit that that letter was sent anonymously and Mr. Thomas denies receiving it, Ms. Harris has testified that she sent it, complaining of the harassment. As well, over that same time period and over the years, she complained to a mandatory reporting authority in Deitra Hartnett, who was a supervisor for the years 2012 through 2017. There is nothing in the record that she reported these complaints up the chain of command. That is the city's policy, and the writer of that policy, Dan Thomas, admits in his deposition that he would expect her to report those complaints if she had received them. My client says she received them for a number of years, and Ms. Hartnett actually accompanied my client to the job site at 6 a.m. to kind of buffer Mr. Proversi's advances when he would make them in the mornings, as well as advising my client to also record him. So if we look at kind of the case law and similar facts, particularly in UPS v. Clark, there was a situation where a mandatory reporting authority had received a complaint but believed that the complaining individual was not actually feeling threatened and made a judgment call to not send it up the chain of command, and that was found to be a violation of the policy. But, you know, Ms. Hartnett says she wasn't a supervisor. What do we do with that? Because you do want us to believe aspects of her deposition testimony, but not that part, I guess. Well, and I believe that is the city's issue. Summary judgment was granted to the city on undisputed facts. It's at least a disputed fact, in my opinion. She is submitting a resume for a promotion and representing that she is this particular individual for that period of time. If she says she doesn't remember and she would refer back to the records, which is what she said in her deposition, I would think that the actual record of her resume that she submitted would be an accurate representation of what she is. There is no other document in the record currently that shows whether or not she was that position, which I submit needs to be determined. I'd reserve my time, my remaining time for rebuttal. Thank you. Certainly, Mr. Borton. Ms. Hedley. May it please the Court. Good morning, Your Honors. Counsel. Katherine Hedley representing the City of Milwaukee at the table. Counsel Vicki Arrowood from O'Neill Banks and Associates represents Mr. Terrence Bromerski. Although there are no claims against him before this bench today, the appellant did raise both of us, so that is why she is here. I want to first start off with a great question in terms of what exactly it is that we are dealing with here for the scope of Ms. Harris's job assignment. She is an infrastructure repair worker. That is a city laborer position. If the court would review the Thomas transcript, which is in the record at ECF 50, Exhibit 4, in that he describes what exactly it is the job duties are. Job duties have remained consistent and similar for infrastructure repair workers. They are to patch potholes in the streets of Milwaukee. They are to build barricades. They are to do various laboring activities. Justice Jackson, you are correct with the city submits that her job description generally allows for and provides that she must clean debris as necessary. Would that be the work site on the street when filling potholes or while in the facility itself? What I don't see in this job description, and we don't have a job description for 2012 to 2015. We only have this 2016 job description. That is one thing. What I don't see in here is what she says Bromerski was threatening her with, which I don't see that in here. I would disagree with counsel's representation that that's what he was threatening her with. It's not counsel's representation. We have Ms. Harris's words. My understanding from her deposition was that she was complaining about being put on the garbage route when the administrator was investigating her claims of sexual harassment. It seems to me reading the record there are two different instances of trash complaints that Ms. Harris has. She has a complaint you just referred to that she was put on trash duty while they were investigating. 33 days. Done. But she also said earlier during the time she was being harassed by Mr. Bromerski, he would say things to her like, you don't want me to put you on trash duty. And that she described as being put on a garbage truck and sent around the city. And I'm asking, where is that in this job description? That is not in the job description. That would require a commercial driver's license and a different job description to do. Not driving. She could be the loader, the laborer on the truck, so the person who gets on and off the truck and gets the trash. You don't need to be driving the truck to do that. Both positions require a commercial driver's license for the city of Milwaukee. Okay. And so that is not in her job description. Correct. So what he was threatening her with was not in her job description. It was not in her job description, nor did Mr. Bromerski have any authority to do that. Okay. And I do want to make that clear. So my review of the case law is that an employer, or I'm sorry, a supervisor is an individual who has been empowered to make a tangible employment decision such as reassignment to a different job description. So there was, in this case, there's copious amounts of evidence in the record. Mr. Thomas has testified to it. Mr. Bromerski himself testified to it. He would not have the ability to transfer her from an infrastructure repair worker to an operations driver worker. So then I need you to address two things for us this morning. One, Mr. Borton's point that we view this from the perspective of the employee when they're in the middle of the harassment. Okay? So that's point number one. And then number two for retaliation, the standard as we've enunciated is what would dissuade a reasonable employee, I'm paraphrasing, from engaging in protected activity. And so address, please, Bromerski's threats on those two axes, not on his actual authority to move her to garbage duty around the city. Sure. For purposes of retaliation, I would submit that that is inapplicable here. So her retaliation claim comes from what happens after she has an interview with Mr. Thomas. That's when she says the retaliation began. That's when she said she was moved to dumpster watch. That's when she said a camera was installed in her work environment, et cetera. So that, from my understanding and from what we've briefed it on, that is the retaliation claim that she's brought up at the district court level. So I want to make that clear. That's my understanding of what we have. And then to your first point, I'm so sorry, I forgot what that question was. Mr. Borton has told us this morning that he wants us to concentrate on the part of the case law that says you judge from the perspective of the employee this issue of authority and the assignment. Sure. And to that, I would say employee. Yeah, correct. And there are several cases in this district and other circuits and other circuits that indicate that while we do view it from the perspective of the employee, it still has to be reasonable. Right. And so in this case, they had no I'm sorry, Mr. Bermersky had no authority to even though he was blustering, allegedly blustering and allegedly saying that he could get her transferred, he could do whatever it is that he wanted to do. He was friends with this person and that person. There is case law that indicates that making those broad associations or making those grand proclamations does not equate to having the actual authority. And I would bring the court's attention back to the fact that the employer has to empower the individual to actually be able to do these things. There is no ability for him to do it. So to that point, because he was not able to make any tangible employment decisions, he was not able to, as counsel agreed and conceded, he could not hire, fire, demote, promote, retain, pay or anything like that. He may have. And again, this is something that's subject to debate because it hasn't been brought to the court and a decision hasn't been made or liability hasn't been found one way or the other. The allegation is that he made these threats to Miss Harris, but Miss Harris didn't do anything with that information. And I want to go ahead and really focus on that aspect of it because if an employer, I'm sorry, if an employee is not a supervisor, which again, the city submits because he had no ability, he had no authority to do any of the actions that this circuit and this U.S. Supreme Court has indicated would make an individual their supervisor, again, a legal supervisor, not necessarily a supervisor for purposes of common word choice here. But because he was not a supervisor, the city then shifts to the coworker liability. And within the coworker liability, the city submits that it has the ability and it is entitled to the other offense. So the city had a reasonable policy that indicated if an individual felt threatened or harassed at work, that they could report it to Dan Thomas specifically. He's specifically named in the policy, as well as the Department of Employee Relations or DER, Justice Easterbrook. I don't want to use another initialism for you, but the city is full of them, unfortunately. They would have the ability to report there, report to Dan Thomas, or to report up their chain of command. In this case, since its inception and seemingly Ms. Harris has put forth again and again that she submitted an anonymous letter in 2012, and from there, the city should have been on some sort of notice that this was happening. She has very little, if you look at the transcript, there's very little indication of when that letter was sent. There's no postmark date for that. We don't have, she claims to have sent it to Mr. Bermersky's live-in girlfriend. Mr. Bermersky has never received that letter. His girlfriend never received that letter. An unknown alderman. When pressed if she could name the alderman, no idea. And then we don't have a date and time wherein she sent it. Maybe sometime in the summer, maybe not. All of these things are very nebulous when what we do have is information from Mr. Bermersky and information from Mr. Thomas that says they never received that letter. Moreover, during her deposition, Ms. Harris, when asked if somebody confronted you with that letter in 2012 and said, did you write this or are you being harassed at work, what would you have said? Would you have said, yes, I am? And she said that she didn't know what she would say. So this hypothetical situation that counsel points to saying that the city was on notice in 2012 is just that. It's a hypothetical. There's no actual demonstrative proof. We have the notice, but there's no metadata. I'm sorry, we have the anonymous letter that was sent, but there was no metadata indicating when it was sent, when it was drafted. And so I would like to point out that I think that that is kind of a red herring. More importantly, when the city actually received notice, and I do want to take a second to just briefly discuss the timeline here. The events allegedly that Mr. Borton was alluding to earlier that I don't want to get into the specifics with due to Ms. Harris's privacy occurred on May 26th, I believe, May 25th, I believe, my apologies. That was a Thursday before Memorial Day weekend. So a three-day weekend elapsed into that time period, and the city was still able to get this information and immediately investigate it within five days of the event taking place, allegedly. So in terms of when the city actually received notice, it immediately acted, or near about immediately, as one can get with notices of that. I want to go ahead and take a second to indicate that the removal of Ms. Harris at that point in time, as I alluded to earlier, was not due to any retaliation, but rather due to investigation. Was she ever informed as to the reason for giving her another job assignment at that point? Was she told that this was a protective measure? My understanding of it is yes. I could not point to a line in the transcript right now that would clearly enunciate that, but I do believe it is part of Dan Thomas' testimony in his deposition. And was she told that it was a temporary measure? Yes, and she was moved back to her position as soon as the investigation was complete. More importantly, and moreover that I really do want to highlight here, is Ms. Harris' lack of cooperation with that own investigation, which goes to that second other point, which is the employee unreasonably failed to take advantage of the protective or corrective opportunities. Is there any standard operating procedure committed to writing that says in the case of a sexual harassment complaint that the alleged victim will be removed from the supervision of the accused perpetrator? I do not believe it is in writing. I do not know if that is something that the city would want to put down in writing. Why is that? I think that might be a policy decision based on each individual department, so I would have to look at the department rules to get the clarity on what the Department of Public Works does. Of course, it could be phrased in fairly general terms. Correct. It could be phrased in a way so that the city had some latitude, but I was kind of surprised there wasn't something. That might be a good point, and I can bring it up to our departments to ensure that they have something like that in writing. However, I do know that it is the policy or that it's the customary practice, and I believe Dan Thomas does, in fact, testify as such. He makes these decisions. I will take a step back. The city's job, obviously, is to put forth the resources and the necessary fundamental jobs of the city, if that makes any sense. In this case, the Department of Public Works, the streets, sanitation, sewers, etc. So when you have an individual who can be removed and not interrupt that operation, that's the person who's going to be moved. So whether that be the alleged victim or an alleged perpetrator for purposes of the investigation. Once that information came through, and this is the point that I want to make briefly, Ms. Harris, and I'm sure Mr. Borton will talk about this, allegedly recorded her conversations with Mr. Bromurski for a period of five years, every single day. When asked if she had any information that said that she was being harassed, she did not supply that information. She did not supply the 2012 letter, and she did not supply any information regarding whether or not she was, in fact, harassed. I do see that I am running out of time briefly, so the city would request that this court affirm Judge Joseph's order dismissing the case. If there's no further questions. Thank you, Ms. Headley. Anything further, Mr. Borton? Thank you. I'd like to touch on the violence against women. The city's anti-harassment policy, which is contained within a large document of its work rules that they hand a very large packet to its employees every year to, quote, read and sign. They don't walk through it at all. They don't discuss anti-harassment or how to report it correctly. They are handed a large pack of rules that says sign it so you can work, and they're not allowed to return to work unless they sign that. Additionally, in addition to the written policy, Dan Thomas, the author of the policy, has stated outside of what's there in writing is that any employee experiencing this type of harassment has the ability to go to any supervisor and complain of it. Again, when asked about complaints made to Ms. Hartnett by Ms. Harris pre the May 25, 2017 incident, he confirmed that in his perspective Ms. Hartnett would have been required to report it, and that did not happen. There is the instance of the other employee, Carrie Graves, who was confronted with some demeaning language from Mr. Bermersky in a sexual nature to which she reported to a mandatory reporting authority, and there is no evidence in Mr. Bermersky's entire employment file that was produced to us that this ever got up the chain of command. And it begs the question, how effective this policy was in practice, and as looking in the case law, merely having a sexual harassment policy will not shield a company from its responsibility to actively prevent sexual harassment in the workplace. The policy must not only be reasonably effective on paper, but also reasonably effective in practice, and I think that the evidence, there is more than enough evidence in the testimony of the countless women that have been deposed that experienced unfortunate harassment by Mr. Bermersky. It begs the question why none of this got brought to the attention of presumably the only person who can put the city on notice, which is Dan Thomas. I think it demonstrates a failure of the administration to train its mandatory reporting authorities to send it up the chain of command, and I'd also note that none of the supposed anti-sexual harassment training materials exist. They were not produced to me. There is one note in Mr. Bermersky's file of a training back in 1999. Other than that, it's replete with anything else. There has been testimony that there is now, after my client's situation, that there is mandatory sexual harassment training that did not exist prior to. So looking at all these things and taking in the totality of the circumstances of what Mr. Bermersky has said, I think it's important to note that there are several claims under Title VII, and particularly whether or not the city is found to be strictly liable, as Mr. Bermersky is her supervisor, or there is also co-worker liability. As to the retaliation claim, Ms. Headley is correct, and I can clarify that today. The retaliation claim is premised on the actions of the city following the May 2015-2017 incident when she was reassigned to pick up trash, and she is now required to pick up trash outside the building as well. Additionally, she had an office that was torn down afterwards, as well as a camera placed right above where she was working. I do see that I'm low on time, and I would just ask that the— Thank you, counsel. Thank you. The case is taken under advisement.